**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MFS & COMPANY, LLC, a Michigan
limited liability corporation as assignee of
claims of CYLTEC, LLC,

      Plaintiff,

v.

CATERPILLAR, INC., a Delaware
corporation,

      Defendant.
_____/

Case No. 09-14063
Hon. Gerald E. Rosen
Mag. Michael Hluchaniuk

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

      Plaintiff MFS & Company L.L.C. ("MFS") brought this diversity suit on October 14,

2009, asserting claims for breach of contract and promissory estoppel.  MFS's claims arise from

Defendant Caterpillar, Inc.'s ("Caterpillar") alleged failure to honor its contractual obligation to

purchase a guaranteed minimum quantity of parts from supplier Cyltec L.L.C. ("Cyltec").  In

September 2009, Cyltec went out of business and assigned all of its potential claims and causes

of action against Caterpillar to MFS.  MFS alleges that it suffered damages in excess of

$9,000,000, including the profits Cyltec would have realized under the contract and Cyltec's

considerable reliance expenses.

      On November 12, 2010, the parties filed cross-motions for summary judgment.  MFS's

motion for partial summary judgment asks the Court to treat as established the allegation that

Caterpillar entered into a contract, under which Caterpillar was required to purchase 131,000

machined cylinder heads from Cyltec.[1]  MFS's motion additionally asks the Court to dismiss or

strike all of Caterpillar's twenty-four affirmative defenses except its nineteenth affirmative

defense.

Caterpillar's motion for summary judgment asks the Court to treat as established the

allegations that: 1) Caterpillar complied with its obligations under all purchase agreements it had

with Cyltec; 2) a binding agreement to purchase a minimum quantity of parts did not exist; and

3) if a contract was entered into, Cyltec repudiated the contract before Caterpillar was able to

complete performance.

Both motions have been fully briefed by the parties.  Having reviewed the parties' briefs

and supporting exhibits, as well as the remainder of the record, the Court finds that the pertinent

allegations and legal arguments are sufficiently addressed in these materials and that oral

argument would not assist in the resolution of these motions.  Accordingly, the Court will decide

both motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of

Michigan.  The Court's opinion and order is set forth below.

## II. FACTUAL BACKGROUND

### A.    The Parties

MFS is a Michigan Limited Liability Company and all of its members are citizens of the

State of Michigan.  MFS received a court-approved assignment of all potential claims and causes

of action against Caterpillar arising from Caterpillar's relationship with Cyltec.

Cyltec was a Michigan Limited Liability Company with its principal place of business in

---

[1] MFS has not asked the Court to decide as a matter of law whether Caterpillar actually breached
the alleged contract for 131,000 machined cylinder heads.  Presumably, MFS will continue to
litigate the issue of breach.

Tecumseh, Michigan.  Cyltec's core competency was the manufacture of cylinder heads, which are detachable plates that cover the closed end of a cylinder chamber in internal combustion engines, and other types of machinery.  Cyltec suffered severe financial losses from 2008 through 2009.  As a result, Cyltec began winding down its operations in August 2009, and assigned its assets for the benefit of creditors in September 2009.

Caterpillar is a Delaware Corporation with its principal place of business in Illinois. Caterpillar is one of the world's largest makers of construction and mining equipment, diesel and natural gas engines, and industrial gas turbines.  Caterpillar conducted business with Cyltec from its warehouse in Lafayette, Indiana.

**B.      The Parties' Business History**

In April 2006, Cyltec began supplying Caterpillar with cylinder heads and connecting rods for its 3500 Series family of engines.  The parties initially conducted their transactions under short-term "blanket purchase orders."[2]  Later that year they began discussing a larger, long-term purchase agreement to help meet increased demand for the 3500 Series engines. Cyltec sent Caterpillar a quotation on February 14, 2007 (the "February Quotation"), in which Cyltec proposed certain guaranteed minimum volume commitments.  On February 22, 2007, Caterpillar sent a letter to Cyltec indicating its intent to execute a multi-year purchase agreement. The letter instructed Cyltec to launch any necessary procurement activities in preparation for the program, but noted that some issues had yet to be finalized.  Specifically, the letter included the following: "[t]his letter is to inform you of our intent to execute a multi-year purchase agreement

---

[2] A "blanket purchase order" appears to be a purchase order that specifies the price and other key terms of the order while leaving the quantity term indefinite at the time the order is placed.  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 6 at 86.)

. . . . While we mutually work through those details, please launch the procurement activities required on your behalf to expedite timely manufacturing start up." (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 11.)

Four subsequent documents embody the dispute between Caterpillar and Cyltec:

1) A price quotation sent by Cyltec to Caterpillar on March 16, 2007.

2) A purchase order sent by Caterpillar to Cyltec on March 30, 2007.

3) Caterpillar's standard terms and conditions used in its purchase orders, including the March 30, 2007 Purchase Order (the "terms and conditions").

4) Beginning April 23, 2007, at least seven drafts of a purchase agreement that were produced, embodying the negotiations conducted by Cyltec and Caterpillar between early 2007 and April 2008 (the "unsigned purchase agreement"). Notably, each is unsigned, and all drafts reference "Minimum Purchase Guarantees."

MFS argues that Cyltec and Caterpillar negotiated and entered into a long-term contractual agreement in 2007, under which Caterpillar agreed to purchase a minimum number of cylinder heads and connecting rods over a multi-year period at agreed upon prices. Caterpillar maintains that no such deal was finalized.

In anticipation of Caterpillar's increased demand for machined cylinder heads, Cyltec apparently made capital expenditures and incurred other preparatory costs. By mid-2009, however, Caterpillar had brought production of the cylinder heads back in-house. Cyltec soon became insolvent, though the precise sequence of events is uncertain. On September 28, 2009, Cyltec filed an assignment for the benefit of creditors. Meanwhile, Cyltec's owner formed MFS for purposes of acquiring certain assets from the assignment. On October 14, 2009, MFS filed suit against Caterpillar for breach of contract and promissory estoppel.

4

## III. ANALYSIS

**A.      Summary Judgment Standard**

Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3]  The Court may also specify facts that are not genuinely at issue, facts which must subsequently be treated as established in the action.  Fed. R. Civ. P. 56(d)(1).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in the light most favorable to the nonmoving party.  *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must–by affidavits or as otherwise provided in [Rule 56]–set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  "The mere existence of a scintilla of evidence that supports the nonmoving party's

---

[3] On December 1, 2010 an amended version of Fed. R. Civ. P. 56 took effect.  Since the parties submitted their summary judgment motions prior to the effective date, the Court's opinion and order is decided under and cites to the former rule.

claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal

quotation marks, and citation omitted). In addition, a party seeking summary judgment on issues

as to which he bears the burden of proof must make a showing "sufficient for the court to hold

that no reasonable trier of fact could find other than for the moving party." *Calderone v. United*

*States,* 799 F.2d 254, 259 (6th Cir. 1986) (emphasis omitted).

**B.     Choice of Law**

1.      Indiana law governs issues of contract formation, termination, and breach.

When sitting in diversity, federal courts must apply the conflict of law rules of the forum

state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941). Here,

MFS filed suit in Michigan federal court, and Michigan's choice of law rules "require a court to

balance the expectations of the parties to a contract with the interests of the states involved to

determine which state's law to apply." *In re Dow Corning Corp.*, 419 F.3d 543, 548 (6th Cir.

2002). MFS makes no argument regarding which state's laws should govern the relationship

between Cyltec and Caterpillar other than to note that it "anticipates that Caterpillar will argue

that Indiana law governs its relationship with Cyltec, while MFS believes that Michigan law

most likely applies." (Pl.'s Mot. for Summ. J. 4 n.4.) Caterpillar indeed claims that Indiana law

should govern. Its basis for this position is a choice of law provision found in its standard

purchase order terms and conditions that states:

> These Terms and Conditions and any Purchase Order shall be
> governed by and construed under the laws of the jurisdiction where
> the office of Buyer issuing the Purchase Order is located. No
> remedy herein provided shall be deemed exclusive of any other
> remedy allowed by law or equity.

(Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 1 at 1.)  In this case, the buyer (Caterpillar) had its office in Lafayette, Indiana.  However, for reasons discussed in Part D, *infra*, the Purchase Order terms and conditions do not control Caterpillar's minimum purchase agreement. Nevertheless, MFS has failed to sufficiently address this issue in its pleadings.[4]

The Michigan Supreme Court follows the approach of the Restatement (Second) of Conflict of Laws ("Restatement") § 188, which provides for the enforcement of that state's law which has the most significant relationship to the transaction and the parties.  *Kipin Indus., Inc. v. Van Deilin Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999).  Here, there is a substantial connection between the parties' alleged contract and Indiana: Caterpillar conducted its business with Cyltec from its warehouse in Lafayette, Indiana, and the unordered cylinder heads would have been delivered to and warehoused in Indiana.  The parties agreed to an Indiana choice of law provision under their blanket purchase orders, so it seems likely that the parties would choose Indiana law for a long-term umbrella agreement as well.  Moreover, fundamental state policies are not implicated by this contract action.  Therefore, the Court will use Indiana law in determining all issues related to interpretation of the contract and for Cyltec's breach of contract claims.[5]

2.      Indiana law governs issues of promissory estoppel.

---

[4] MFS appears to indicate its indifference to Indiana law governing when it states "[f]or purposes of this motion, the choice of law will not affect the outcome."  (Pl.'s Mot. for Summ. J. 4 n.4).

[5] Both Michigan and Indiana have adopted, with revisions, the Uniform Commercial Code. *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 853 n.7 (Ind. Ct. App. 2007); *Davis v. Forest River, Inc.*, 748 N.W.2d 887, 890 (Mich. Ct. App. 2008).

Caterpillar does not advance authority to support its contention that Michigan law applies to MFS's promissory estoppel claim.  (Mem. in Supp. of Def.'s Mot. for Summ. J. 18.)  Instead, Caterpillar  mistakenly identifies the choice of law provision in the Purchase Order as a forum selection clause and dismisses any affect it might have out of hand.[6]  (Mem. in Supp. of Def.'s Mot. for Summ. J. 18 n.13.)  In accordance with § 188 of the Restatement, as discussed above, there exists a substantial connection between the State of Indiana and the parties' business relationship.  Furthermore, Cyltec and Caterpillar's history as business partners is central to the facts from which MFS's promissory estoppel claim arose, and no fundamental state policies are implicated.  As a result, Indiana law will apply to the promissory estoppel issue as well.[7]

## C.    The Parties Formed a Minimum Purchase Contract

MFS's motion for partial summary judgment asks the Court to treat as established the allegation that Caterpillar entered into a contract with Cyltec, under which Caterpillar was required to purchase 131,000 machined cylinder heads.  MFS contends that the March 30, 2007 Purchase Order issued by Caterpillar explicitly affirms the existence of a broader umbrella

---

[6] A forum selection clause indicates a specific state or court as the controlling jurisdiction in the event that a dispute arises from the contract or the contractual relationship.  *See Johnston County v. R.N. Rouse & Co., Inc.*, 414 S.E.2d 30 (1992); 17A Am. Jur. 2d Contracts § 259. The terms and conditions clause does not specify a state or court in which jurisdiction should prevail, as a forum selection clause would.  Rather, the clause is properly understood as a choice of law provision.

[7] Generally, the elements of promissory estoppel achieve the same result in both Indiana and Michigan. *Compare Marerro v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1992) (holding that promissory estoppel requires: (1) a clear and definite promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; (3) which in fact produced reliance or forbearance of that nature; and (4) in circumstances such that the promise must be enforced if injustice is to be avoided), *with Kacak v. Bank Calumet, N.A.*, 869 N.E.2d 1239, 1242 (Ind. Ct. App. 2007) ("(1) a promise by the promisor; (2) made with the expectation that the promise will rely thereon; (3) which induces reasonable reliance by the promise; (4) of a definite and substantial nature; and (5) injustice can be avoided only on enforcement of the promise").

agreement to purchase at least 131,000 machined cylinder heads.  Under a heading titled "Item

Comments," the March 30, 2007 Purchase Order provides:

> This purchase order is part of an umbrella agreement wherein
> Caterpillar agrees to purchase a combined total of 131,000
> machined heads within 18 months of PPAP Approval / SOP after
> which the price will reduce to $65.68.  Reference Cyltec quotation
> #060905-3 dated 3/16/07.

(Pl.'s Mot. for Summ. J. Ex. 2 at 2.)  MFS argues that the Purchase Order language demonstrates

Caterpillar's unambiguous recognition of the umbrella agreement.  (Pl.'s Resp. in Supp. of Mot.

for  Summ. J. 2-3.)

By contrast, Caterpillar maintains that the language cited by MFS in the Purchase Order

does not reflect the entire relationship between it and Cyltec.  Caterpillar suggests that the

language in the Purchase Order regarding 131,000 machined heads merely refers to ongoing

negotiations between the parties.  (Mem. in Supp. of Def.'s Mot. for Summ. J. 3-4.)  Caterpillar

cites two documents which it argues are specifically incorporated into the Purchase Order and

negate the existence of any minimum quantity contract: the March 16, 2007 Price Quotation and

the terms and conditions incorporated in all of Caterpillar's purchase orders, including the March

30, 2007 Purchase Order at issue here.  Caterpillar argues that these documents negate the

possibility of an agreement on guaranteed minimum quantities.[8]

"A contract for sale of goods may be made in any manner sufficient to show agreement,

including conduct by both parties which recognizes the existence of such a contract."  Ind.

Code § 26-1-2-204(1) (2002).  Under Indiana law, a binding contract requires a meeting of the

---

[8] Because Caterpillar's argument concerning the purchase order terms and conditions is
necessarily intertwined with Caterpillar's own motion for summary judgment, Caterpillar's
argument based on the terms and conditions is discussed in detail in Part D, *infra*.

minds on material terms; a mere agreement to agree does not form the basis of a binding contract. *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 357 (7th Cir. 2001). "An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." Ind. Code § 26-1-2-204(2). "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Ind. Code § 26-1-2-204(3). "The intent relevant in contract matters is not the parties' subjective intents, but their outward manifestation of it." *Zimmerman v. McColley,* 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). Moreover, a contract for goods worth over $500, as here, requires "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought" unless, between merchants, "a writing in confirmation of the contract and sufficiently against the sender" is received and not objected to within a reasonable time. Ind. Code § 26-1-2-201.

The Court finds that the Item Comments section of Caterpillar's March 30, 2007 Purchase Order clearly evinces an agreement that Caterpillar would purchase 131,000 machined cylinder heads from Cyltec. *See* Ind. Code § 26-1-2-04(1). The Purchase Order constitutes a writing, and the Item Comments section clearly indicates that a contract for sale was made between the parties. *See* Ind. Code § 26-1-2-201(1). The March 30, 2007 Purchase Order is an outward manifestation of a prior meeting of the minds; it uses present tense, active language to describe the agreement and is not precatory in the slightest. *See Zimmerman*, 826 N.E.2d at 77. Moreover, since the Purchase Order acknowledging the minimum purchase contract was issued by Caterpillar on Caterpillar letterhead, it constitutes a writing signed by Caterpillar, the party

against whom enforcement is sought.  *See Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d

1178, 1185 (7th Cir. 1991) (holding that a memorandum confirming a contract on company

letterhead satisfied both the writing and signature requirement of the statute of frauds); *Owen v.*

*Kroeger Co.*, 936 F. Supp. 579, 584 (S.D. Ind. 1996) (same, and collecting similar cases from

other jurisdictions).

  In the alternative, since both Cyltec and Caterpillar qualify as merchants,[9] the Purchase

Order can also be read as clear, written confirmation of the parties' contract, to which neither

party objected.  *See* Ind. Code § 26-1-2-201(2).  Finally, while the Item Comments section does

not list every term of the parties' contract, the agreement does not fail for indefiniteness since

"there is a reasonably certain basis for giving an appropriate remedy."  Ind. Code § 26-1-2-

204(3).  That is, Caterpillar clearly acknowledged that an agreement existed whereby Caterpillar

would purchase at least 131,000 machined cylinder heads from Cyltec.

  Caterpillar responds by arguing that the document referenced in the Item Comments

section of the Purchase Order actually negates the existence of a minimum purchase contract.

That document, Cyltec Quotation #060905-3 (March 16, 2007), contains a section outlining

changes from an earlier quotation dated February 14, 2007.  Specifically, Caterpillar points to an

entry in the changes section stating that one such revision was to "[e]liminate CAT minimum

volume commitment."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 14 at 1.)  Caterpillar

argues that this provision of the March Quotation signifies the elimination of a previously-

---

[9] Merchant "means a person who deals in goods of the kind or otherwise by his occupation holds
himself out as having knowledge or skill peculiar to the practices or goods involved in the
transaction . . . ."  Ind. Code § 26-1-2-104(1).  Both Cyltec and Caterpillar deal in machined
cylinder heads and related goods as part of their businesses; and both hold themselves out as
having specialized knowledge or skill regarding machined cylinder heads.  Therefore, Cyltec and
Caterpillar are both merchants under Indiana law.

negotiated minimum volume commitment of 131,000 machined cylinder heads.  (Def.'s  Resp. to Pl.'s Mot. for Summ. J. 4.)  MFS counters by claiming that the statement in fact refers to the deletion of a provision in the February 14, 2007 Quotation which would have required Caterpillar to purchase an additional 15% of its overall requirement after meeting the 131,000 minimum guaranteed by the umbrella agreement.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 4.)

The evidence confirms MFS's reading.  The February 14, 2007 Quotation contains a paragraph that reads as follows: "[a]fter 131,000 machined heads and 66,000 assembled heads <u>CAT is committing to purchase from Cyltec a minimum volume of 15% of total program demand</u> . . . ."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 9 at 2) (emphasis added.)  That language is absent from the March 16, 2007 Quotation.  Caterpillar's reading of the language in the changes section of the March 16, 2007 Quotation is contradicted by the evidence and thus does not impact the Court's finding that a minimum purchase contract for 131,000 machined heads exists.

From a business perspective, it appears likely that Caterpillar acknowledged its minimum purchase agreement in the March 30, 2007 Purchase Order to ensure that it received credit for the machined heads ordered under that Purchase Order.  That is, knowing that a minimum quantity requirement existed, Caterpillar sought to ensure that any order for machined heads would count towards the 131,000 minimum required under Caterpillar's umbrella agreement with Cyltec.  Nonetheless, the rationale for Caterpillar recognizing its minimum purchase contract in the March 30, 2007 Purchase Order does not affect the outcome here.  For the reasons discussed above, the Court finds that MFS has presented sufficient evidence to demonstrate that no dispute of material fact exists regarding Caterpillar's minimum purchase commitment, and

MFS is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(1); *Calderone,* 799 F.2d at 259.

**D.      Summary Judgment is Proper Insofar as Caterpillar Did Not Have the Power to Terminate the Contract**

Caterpillar asserts that, even in the event that a minimum purchase contract existed, it did not breach the agreement because its standard purchase order terms and conditions gave Caterpillar the unilateral authority to terminate a purchase order such as the one at issue here. (Mem. in Supp. of Def.'s Mot. for Summ. J. 9-10.)  In particular, Caterpillar claims that the terms and conditions grant Caterpillar the authority to unilaterally terminate or suspend the March 30, 2007 Purchase Order in the event a minimum purchase contract exists.  The Court found that Caterpillar recognized its minimum purchase agreement in the March 30, 2007 Purchase Order, and Caterpillar claims that the terms and conditions of the Purchase Order give Caterpillar the power to terminate the umbrella agreement *ipso facto*.  (*See id.*; Ex 10 at 109.) This argument fails because the terms and conditions use language too limited to support Caterpillar's position.  Moreover, because no further dispute exists as to the issue of Caterpillar's power to terminate--an issue fully briefed by the parties--the Court will grant summary judgment in favor of MFS as to Caterpillar's inability to terminate its contract with Cyltec.  *See* Fed. R. Civ. P. 56(d)(1).

The terms and conditions explicitly limit Caterpillar's power to terminate or suspend to "any part of underlined Items or quantities on any outstanding purchase order . . . ."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 1 at 1) (emphasis added.)  As this language makes clear, Caterpillar has the authority to terminate or suspend actual goods ordered and undelivered under a particular purchase order, but not the authority to unilaterally terminate an umbrella contract

that exists separate and apart from Caterpillar's March 30, 2007 Purchase Order.  Caterpillar's

acknowledgment of the minimum purchase agreement in the March 30, 2007 Purchase Order

does not bring that separate contract within the auspices of Caterpillar's circumscribed terms and

conditions.[10]

MFS correctly argues that "Caterpillar and Cyltec had two distinct levels of contractual

relationship--the umbrella agreement governing Caterpillar's contractual obligation to purchase

the Minimum Quantity Guarantees, and Caterpillar's purchase orders governing (at most)

Caterpillar's purchases of specific parts."  (Pl.'s Resp. in Supp. of Mot. for  Summ. J. 2-3.)  The

parties had an overarching agreement whereby Caterpillar committed to purchasing at least

131,000 machined heads.  The purchase orders issued by Caterpillar for machined heads

constituted separate purchase agreements in pursuit of Caterpillar's overall guaranteed

minimum.  The March 30, 2007 Purchase Order does not constitute the umbrella agreement *per

se*.  Rather, the Item Comments section confirms the existence of an umbrella agreement.  The

terms and conditions accompanying this Purchase Order did not give Caterpillar the power to

terminate the minimum purchase contract with Cyltec, nor does Caterpillar seem to have claimed

that it terminated its agreement until this litigation began.  Therefore, because no issue of

---

[10] The same reasoning provides the basis for rejecting Caterpillar's claim that the minimum
purchase agreement recognized here somehow contravenes Caterpillar's explicit rejection of
documents external to the Purchase Order through its terms and condition.  (Mem. in Supp. of
Def.'s Mot. for Summ. J. 8-9.)  Caterpillar resists the recognition of a minimum purchase
agreement by suggesting that any such agreement constitutes a document that is necessarily void
as parol evidence given the integration clause included with Caterpillar's purchase orders.
Caterpillar fails to appreciate, however, that the Item Comments section of the March 30, 2007
Purchase Order merely provides evidence of the umbrella agreement's existence through
Caterpillar's recognition thereof; the Purchase Order does not purport to memorialize the
minimum purchase agreement.  The Court notes the irony in arguing that a contract does not
exist because of parol evidence while simultaneously pointing to external documents to support
that same claim.

material fact exists, summary judgment is granted to MFS; Caterpillar lacked the power to terminate its minimum purchase agreement with Cyltec.  *See* Fed. R. Civ. P. 56(c)-(d).

**E.      Summary Judgment is Improper as to Anticipatory Repudiation**

Caterpillar further argues that, even if a long-term contract existed, Cyltec disaffirmed it when performance ceased, entitling Caterpillar to invoke the doctrine of anticipatory repudiation. (Mem. in Supp. of Def.'s Mot. for Summ. J. 17.)  Anticipatory repudiation may completely eliminate a party's obligations under a contract "when reasonable grounds for insecurity arise with respect to the performance of either party."  Ind. Code. § 26-1-2-609.  In order to constitute anticipatory repudiation, the renouncement of the contract "must be positive, absolute, and unconditional."  *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n Inc*., 692 N.E.2d 905, 911 (Ind. Ct. App. 1998).

Although Caterpillar argues that Cyltec committed anticipatory repudiation, it fails to cite evidence that supports a finding that no genuine dispute of material fact exists.  Caterpillar's strongest evidence is an April 24, 2009 email correspondence in which Michael Shields ("Shields"), President of Cyltec, indicated that Cyltec was considering winding down its operations because it could not sustain continued losses.  The email from Shields merely states, however,  that Shields "still believe[s] [Cyltec] should consider a wind down of Cyltec operations."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 23.)  The Court is not convinced that this statement satisfies the threshold requirement for anticipatory repudiation: "because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one."  *Jay County Rural Elec. Membership Corp.*, 692 N.E.2d at 911.  Shields expressed a belief, and precatory language does not rise to the

15

level of anticipatory repudiation.  Anticipatory repudiation requires an unequivocal repudiation of the contract, and the Shields email does not suffice.  Furthermore, the record suggests that Caterpillar itself may have repudiated the contract prior to Cyltec filing an assignment for the benefit of creditors on September 28, 2009, thus creating an important factual dispute.  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 19 at 90.)

Three pieces of evidence plausibly indicate that Christopher White ("White"), Caterpillar's Purchasing Manager, communicated Caterpillar's intent to disavow its relationship with Cyltec.  First, White testified that, after the first quarter of 2009, Caterpillar could satisfy demand through internal production, and that Caterpillar presumed that its only obligation to Cyltec was purchasing Caterpillar's supplemental demand.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 13 at 24-25; Ex. 24 at 255-58.)  Second, according to Shields, White stated in an April 9, 2009 meeting that no minimum purchase guarantee existed as to Caterpillar; and, as a result, Caterpillar did not intend to purchase from Cyltec parts that Caterpillar could produce internally.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7 at ¶ 7.)  Third, a June 26, 2009 email sent from Caterpillar's Matt Hansen to Cyltec's Kent Lowery seems to demonstrate Caterpillar's intent to cease performance and Caterpillar's communication of that fact to Cyltec: "[m]y understanding is that due to the lower build rates, we will be bringing the rods and heads back in-house.  Chris White (Purchasing Manager) said this has been communicated to Cyltec."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 25.)  Viewing this evidence in the light most favorable to Cyltec, the Court finds that a reasonable trier of fact could hold that Caterpillar in fact repudiated the contract prior to full performance.  Therefore, summary judgment is inappropriate as to anticipatory repudiation.

16

**F.       Summary Judgment is Improper as to Promissory Estoppel.**

Caterpillar contends that Cyltec was unreasonable in its reliance on any alleged promises made by Caterpillar and that summary judgment on promissory estoppel should be granted in Caterpillar's favor.  Establishing a promissory estoppel claim requires the following elements: "(1) a promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only on enforcement of the promise." *Kacak v. Bank Calumet, N.A.*, 869 N.E.2d 1239, 1242 (Ind. Ct. App. 2007).[11]

Caterpillar argues that there is no evidence that reasonably supports Cyltec's claim of reliance.  (Mem. in Supp. of Def.'s Mot. for Summ. J. 18.)  In *Aleris Aluminum Canada L.P. v. Valeo, Inc*., 718 F. Supp. 2d 825 (E.D. Mich. 2010), which Caterpillar relies on, the court found a lack of reasonable reliance on one party's letters of intent because the letters were expressly conditional.  718 F. Supp. 2d at 836.  Despite Valeo's insistence on a commitment, Aleris maintained in its letter that it would not sign the agreement without a new labor contract in place. The court noted, "Valeo was aware of Aleris's situation and proceeded at its own risk; it cannot now force a commitment on Aleris that Aleris explicitly refused to make." *Id.* at 835.

Unlike *Aleris*, Caterpillar's instruction to Cyltec regarding capital expenditures does not contain conditional language.  The letter unconditionally tells Cyltec to "launch the procurement activities required on your behalf to expedite timely manufacturing start up."  (Mem. in Supp. of

---

[11] Michigan law uses the same standard: (1) a clear and definite promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; (3) which in fact produced reliance or forbearance of that nature; and (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *Marerro v. McDonnell Douglas Capital Corp*., 505 N.W.2d 275, 278 (Mich. Ct. App. 1992) (quotations omitted).

17

Def.'s Mot. for Summ. J. Ex. 11.)  Had Caterpillar intended to limit the terms of the agreement, it could have expressly stated as much in its letter of intent.  Consequently, the Court finds that Caterpillar's reliance on *Aleris* is without merit.

Although the February 22, 2007 letter of intent notes that several issues remained unfinalized, Caterpillar instructed Cyltec to launch necessary procurement activities, thereby ensuring timely delivery while negotiations continued.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 11) ("While we mutually work through those details, please launch the procurement activities required on your behalf . . . .")  Cyltec represented to Caterpillar that it had begun the capital and tooling process in a February 22, 2007 email correspondence,[12] the February 14, 2007 Price Quotation,[13] and the March 16, 2007 Price Quotation,[14] which suggests that Caterpillar was aware of Cyltec's readiness to undertake significant capital expenditures.  Caterpillar would have had an obligation to notify Cyltec of uncertainty that would disrupt their relationship so Cyltec could mitigate damages.  Since Caterpillar did not inform Cyltec that it should cease procurement activities, a trier of fact could find that Cyltec acted reasonably in procuring capital

---

[12] Muzo sent an email correspondence to Kim Young, Caterpillar's top purchasing representative at the Lafayette facility, which stated, "[b]ased on your letter Cyltec will proceed with the procurement of capital supporting the program launch of the 3500 cylinder head and connecting rod projects as we have discussed and quoted."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 13.)

[13] The Sourcing Commitment of the February 14, 2007 Price Quotation stated that "[b]ased on your written commitment on the connecting rod and cylinder head we will release orders for capital and tooling to support both the long-term and short-term needs of each program."  (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 9.)

[14] The Sourcing Commitment of the March 30, 2007 Price Quotation stated, "[b]ased on your written commitment dated February 22, 2007 on the connecting rods and cylinder head we have released orders for capital and tooling to support both the long-term and short-term needs of each program." (Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. 14.)

and is entitled to the cost of capital improvements as a result.  Therefore, summary judgment is denied.  Fed. R. Civ. P. 56(c).

## G.    Caterpillar's Affirmative Defenses

MFS also moves to dismiss twenty-three of Caterpillar's twenty-four affirmative defenses.  The "[C]ourt may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "A three-part test has been developed to determine whether a federal court should strike an affirmative defense: '(1) the matter must be properly pleaded as an affirmative defense; (2) the matter must be adequately pleaded under the requirements of [Rules] 8 and 9; and (3) the matter must withstand a Rule 12(b)(6) challenge–in other words, if it is impossible for defendant[] to prove a set of facts in support of the affirmative defense that would defeat the complaint, the matter must be stricken as legally insufficient.'"  *FTC v. Mazzoni & Son, Inc.*, No. 06-15766, 2007 WL 2413086, at *2 (E.D. Mich. Aug. 14, 2007) (quoting *Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 904-05 (N.D. Ohio 2003)).  Thus, if a question of fact exists regarding proof of an affirmative defense, then dismissal is not appropriate.  Because Caterpillar has taken a shotgun approach to pleading affirmative defenses, many defenses are duplicative of each other.  As a result, the Court will field overlapping or repetitive defenses collectively. Caterpillar's affirmative defenses are addressed below.

Caterpillar's first affirmative defense claims that MFS fails to state a claim for which relief can be granted based on the terms and conditions included in Caterpillar's Purchase Order and the unsigned purchase agreement.  This argument fails because, as discussed above, MFS

and Caterpillar had a minimum purchase contract.  Therefore, MFS has necessarily stated a legally sufficient claim to relief, and Caterpillar's first affirmative defense is dismissed.

Caterpillar's second and eleventh affirmative defenses argue that MFS's claimed breach of contract is barred by the statute of frauds or, alternatively, for lack of a signed agreement. These contentions are also addressed in this opinion.  For the reasons discussed earlier, Caterpillar recognized the existence of a minimum purchase agreement in a document that satisfies the statute of frauds.  Therefore, Caterpillar's second and eleventh affirmative defenses are dismissed.

Caterpillar's third and fourth affirmative defenses contend that Caterpillar did not cause any of the damages claimed by MFS.  Caterpillar supports this contention by reference to the terms and conditions contained in Caterpillar's Purchase Order and by stating that Cyltec suffered losses as a result of business decisions and market forces, rather than any act of Caterpillar.  However, the Court has found that a minimum purchase contract exists; and MFS bases its claim for damages on Caterpillar's breach of that contract or, in the alternative, on Cyltec's reasonable reliance on Caterpillar's promises.  While Caterpillar's market forces defense may be somewhat implausible, it is not "impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the complaint[.]"  *Mazzoni & Son, Inc.*, 2007 WL 2413086, at *2.  Therefore, Caterpillar's third and fourth affirmative defenses are not dismissed.

Caterpillar's fifth, sixth, sixteenth, twentieth, and twenty-fourth affirmative defenses each allege that MFS's claims are barred based on the insolvency of Cyltec and its subsequent assignment for the benefit of creditors.  This argument is founded on provisions of the unsigned

20

purchase agreement and the March 30, 2007 Purchase Order.  These defenses survive to the extent they rely on the unsigned purchase agreement.  As discussed earlier in this opinion, the terms and conditions of the March 30, 2007 Purchase Order do not control the minimum quantity agreement.  Questions of fact remain, however, regarding the effect of the unsigned purchase agreement as well as the sequence of Caterpillar's alleged breach and Cyltec's insolvency.  These affirmative defenses thus remain plausible.  Therefore, Caterpillar's fifth, sixth, sixteenth, twentieth, and twenty-fourth affirmative defenses are not dismissed.

Caterpillar's seventh affirmative defense relies in part on the unsigned purchase agreement to contend that MFS's claims are barred because of Cyltec's change in ownership or control.  As stated immediately above, questions of fact remain regarding the unsigned purchase agreement and the timing of events leading to Cyltec's change in ownership.  Therefore, Caterpillar's seventh affirmative defense is not dismissed.

Caterpillar's eighth and twenty-third affirmative defenses allege that MFS's claims are barred by accord and satisfaction because Caterpillar paid for goods received from Cyltec.  MFS does not claim that Caterpillar failed to pay for goods received, however.  Rather, this dispute is concerned with the failure to fulfill a  minimum purchase contract and the capital losses suffered in reliance on the contract.  Therefore, Caterpillar's claim of accord and satisfaction based on goods received and paid for is "immaterial" and dismissed accordingly.  Fed. R. Civ. P. 12(f).

Caterpillar's ninth affirmative defense claims that MFS lacks standing to raise the claims of Cyltec.  This defense necessarily fails, however, because MFS is the court-approved assignee of Cyltec's claims against Caterpillar.  (Pl.'s Mot. for Summ. J. Ex. 11.)  Therefore, Caterpillar's ninth affirmative defense is dismissed.

Caterpillar's tenth affirmative defense asserts that MFS's promissory estoppel claim fails for lack of reliance. As discussed earlier, questions of fact remain regarding MFS's promissory estoppel claim. *See Mazzoni & Son, Inc.*, 2007 WL 2413086, at *2. As a result, this defense is legally sufficient. Therefore, Caterpillar's tenth affirmative defense is not dismissed.

Caterpillar's twelfth, thirteenth, seventeenth, and eighteenth affirmative defenses argue that MFS's claims are barred based on Cyltec's deteriorating financial condition in April 2009. Caterpillar states this defense variously as an inability to perform, impossibility of performance, release, and changed circumstances. Cumulatively, these defenses depend on facts pertaining to Cyltec's financial condition and the impact Cyltec's financial situation had on the relationship between Cyltec and Caterpillar. Important questions of fact remain unresolved. Therefore, Caterpillar's twelfth, thirteenth, seventeenth, and eighteenth affirmative defenses are not dismissed.

Caterpillar's fourteenth and fifteenth affirmative defenses argue that MFS's claims are barred because Cyltec and Caterpillar either rescinded or mutually abandoned their agreement. While the Court has found that a minimum purchase contract existed between Cyltec and Caterpillar, questions of fact remain regarding events subsequent to the formation of the contract. Therefore, Caterpillar's fourteenth and fifteenth affirmative defenses are not dismissed.

Caterpillar's twenty-first affirmative defense alleges that MFS's claims are barred based on a failure of consideration on Cyltec's part. In particular, Caterpillar claims that Cyltec requested a sum of money in exchange for continuing its manufacturing operations without offering any consideration in exchange. MFS's claims, however, involve a minimum purchase contract and capital expenditures made in purported reliance on the minimum purchase contract.

22

This defense bears no relation to MFS's claims as alleged and is thus immaterial and impertinent to this case. *See* Fed. R. Civ. P. 12(f). Even if Cyltec proposed a contract modification without offering consideration, the offer would have no bearing on Caterpillar's obligations under the contract as it existed. Therefore, Caterpillar's twenty-first affirmative defense is dismissed.

Caterpillar's twenty-second affirmative defense argues that MFS's claims are barred based on Cyltec's alleged misrepresentation of its financial condition. As with Caterpillar's defenses based on Cyltec's insolvency and assignment for the benefit of creditors, questions of fact remain regarding Cyltec's finances and the sequence of events leading to Cyltec's dissolution. Therefore, Caterpillar's twenty-second affirmative defense is not dismissed.

## IV. CONCLUSION

For the reasons set forth in this opinion and order, the Court finds that summary judgment is appropriate as to the existence of a minimum purchase contract between Cyltec and Caterpillar, but inappropriate as to the issues of Caterpillar's right to terminate, anticipatory repudiation, and promissory estoppel. Furthermore, the Court finds that Caterpillar's first, second, eighth, ninth, eleventh, twenty-first, and twenty-third affirmative defenses are insufficient, immaterial, or redundant as a matter of law; and that Caterpillar's third, fourth, fifth, sixth, seventh, tenth, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, twentieth, twenty-second, and twenty-fourth affirmative defenses are sufficient as a matter of law.

THEREFORE, IT IS HEREBY ORDERED that Plaintiff's November 12, 2010 motion for partial summary judgment [Dkt. #91] is GRANTED IN PART, in accordance with the rulings in this opinion and order.

23

IT IS FURTHER ORDERED that Defendant Caterpillar's November 12, 2010 motion for summary judgment [Dkt. #92] is DENIED, in accordance with the rulings in this opinion and order.

S/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  October 6, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 6, 2011, by electronic and/or ordinary mail.

S/Felicia Moses for Ruth A. Gunther
Case Manager